OK, for appellant, we have James Dionne. Correct. All right. Thank you. And for appellee, Howard Cowart. Correct. Mr. Dionne, please proceed. And if you want to have rebuttal argument, please stop short of that whole thing. OK, Your Honor, I'd like to reserve a minute or two. May it please the Court, my name is James Dionne. I represent the Mercer Island School District in this matter. The premise under which we're here today that's caused us to be here today is that the district court judge in this case felt that the education that was provided by Mercer Island School District to the student K.L. was, the bar was set too low for her. And the district does not believe that that was true. The district believes it's a very challenging program. And I think the best person to say whether or not it was that that statement was true and whether or not it was a challenging program is the student K.L. herself. When she went to Landmark School, one of the questions they asked her is, what is the reason, what is the reason that the thing that you like least about the Mercer Island School District? And she replied that she was tired of having her special education resource room teacher push her too hard and not let her relax. She also, the second reason she gave was because she was tired of being pressured into being an A student. The facts show that the Mercer Island School District is a very challenging school district. It's filled with high achievers. The community is a community of high achievers. There are very high expectations for the school system. And they try to, and the parents expect the school district to be providing high expectations to their children. One second, please. Stacey, or I'm sorry, Ken. The clock's not running, Ken. And the truth of the matter is that the student, K.L., was a high achiever while she was at Mercer Island School District. Well, let me ask you this. It seems to me that probably the most important issue in this case is that the district judge said that the Raleigh Adams standard, which is something that all of the school districts have to deal with, was changed by the 1997 amendments. And because of that change, that seems to me to be the most important legal issue. It is, correct, Your Honor. I mean, obviously, there's factual either way. But the most important legal issue here is whether that standard was changed. And then we get into the facts. Because if the standard was changed, then the facts are viewed in a different light than they are if the Raleigh Adams standard is still in the same place. I think the point the district is making, the school district actually believes it satisfies whatever standard the court feels is the standard, that the student would meet the highest standard that you could set or the Raleigh standard as it currently exists. But with respect to the specific question about whether or not the Raleigh standard has changed, we believe, actually, that there's no legal basis for that decision to have been made. The court said both that the school district didn't set the bar too low, didn't set it high enough, and the administrative law judge didn't set it high enough, too, because she relied on the Raleigh standard. Counsel, I have a question for you on that. Assuming for a moment that we were to agree with you that the district court couldn't change the Raleigh standard based on the legislation, in that case, would it be proper to remand the case back to the district court to apply the Raleigh standard? Or on this record, could we assess whether there was an IEP and so on? Your Honor, I think the evidence is correct. I think the evidence is so clear in this case that the district has satisfied not only the Raleigh standard, but at least the Raleigh standard, that the school district asked that the court simply affirm the administrative law judge and reverse the district court. Well, now, but wait. I don't entirely agree with you. No, I'm sure they don't, Your Honor. But there's two decisions of the administrative law judge, all right? Because am I not correct that the first decision of the administrative law judge, the district court sent it, didn't the district court send it back? And then the administrative law judge did then award the parents certain reimbursements for Landmark and certain other reimbursements because the ALJ felt compelled by what the district court was saying. And then it's my understanding that both sides appealed from that. And then the district judge took another stab at it and then were reviewing that. So when you say that the ALJ got it right, are you talking about the first time or the second time? Well, actually, the second time, they didn't duplicate each other. The issue before the administrative law judge the second time was just assuming that her decision was wrong, then what would be the remedy? And so she then had to go decide what would be the remedy. And that was her direction on remand from the district court. So she then said, OK. She refused to reconsider the decision of the district court as would be reasonable, that she was ordered to agree with the district court that she had made a mistake on the satisfaction of the Raleigh standard. She only dealt with, now I have to deal with what's the remedy since my original decision was wrong. So the second opinion was the amount of damages, the amount of compensatory services that were going to be provided to the student assuming that the school district's IEPs were inappropriate. And again, that went up to the district court. And of course, then she reversed the administrative law judge on parts of her decision on that also. So I mean, I guess when you say that,  is it your position that the parents are entitled to no reimbursement for landmark and no attorney's fees? The district, absolutely, Your Honor. The only, you only get to that question when you find the school district's IEPs were inappropriate. And that is what the administrative law judge originally found, that they were appropriate. I know. Well, that's, but the second. She never did say that they were inappropriate. She was only agreeing with the district court who told her that wasn't before her anymore. She was, and the only issue that she had to decide was what's the remedy. Well, the remedy's a partial remedy. I mean, it's a partial amount of the tuition. It's not the whole thing, right? Well, the student was moved out of the school district after two years of being there. So the school district had no duty to provide services to her after two years. And the court ordered three years of remedies. So, and she was only there three years. So essentially, that's a, you know, I don't know what the. Well, that's part of the money damage, right? Correct. So you're disagreeing with the compensatory because. Absolutely, Your Honor. The court said that because that wasn't correct in, I don't know, ninth grade or whatever, that then you have to pay for the senior year, too. Correct. Right? Right. And the district court ordered more attorney's fees than. What's stipulated by the parties. But, all right. Now, the district police, you don't even get to the compensatory services. Because the school district's IAPs for eighth grade, ninth grade, which is the freshman year of high school, those are the only two years that she actually are at issue when she was in the Mercer Island School District. Those IAPs were appropriate. They meet the standard of the Raleigh substantive benefit that was provided to the student. And there were no procedural errors that caused harm to the student. If the court agrees with the school district's position on those two issues, which was the decision of the administrative law judge, then you don't get to the compensatory services. You don't get to the attorney's fees. And everything that the administrative law judge did the second time is irrelevant. Now, in the red brief, I have read it 55, the plaintiffs alleged that, that would be the appellees, obviously, that the Mercer Island School District withheld from parents evaluation results, revealing KL's lack of progress when developing her ninth and 10th grade IAPs. Do you know what results that the plaintiffs are referring to? And what's your response to that allegation? There's several responses, Your Honor. First, the response is that the issue was not exhausted at the administrative case due process hearing, because it wasn't raised as one of the issues that was going to be argued. And as a matter of due process, the school district did not have advance notice that there was even an issue there. The second issue is that this court's precedents say you can't hide evaluations. The district did not hide an evaluation. There was no request for an evaluation. The parent participated in that evaluation. And the Department of Education has said that no school district is required to provide an evaluation before an IAP meeting unless it's requested by a parent. It was never requested by the parent. Had it been, in fact, the school district's case in this, there's only a couple statements in the record. It's a very minimal record at all that even makes this something to talk about. And the school district's belief is that it was discussed and it was provided at the IAP meeting. And you only have a simple, it wasn't, we don't remember it was, response to it. And that's the limit of that particular issue, Your Honor. So we don't think that's a legitimate issue to even be decided. But if it has to be decided, it should be decided in favor of the school district. Well, let me ask you this. Let's, obviously, the district court felt that Landmark did a better job with the students than the district was doing. All right? And let's just say that I think that, just for, let's say hypothetically, that they do a better job. Now, but I also notice in Congress's language, it talks about that the district has a duty to mainstream students. What position is a school district in with regard to, and Landmark is not really, I guess you could argue that Landmark maybe was mainstreaming in the sense that if you do that for a while and then you put them back. But Landmark is all students with learning disabilities, right? So that wouldn't be considered a mainstream environment. What is a district, how does a district approach that issue that Congress says, on the one hand, that you have a duty to mainstream, and then on the other hand, that a school like Landmark might do a better job in ultimately mainstreaming someone? What, you know, how is that dealt with? The actual, the very specific answer to that question is the school district is required to mainstream unless the standards of the Ninth Circuit case of Rachel show that there's not any, if there's educational benefit in the school system, there's social benefit in the school district, non-academic benefit, and there's no harm to the other students, and a fourth factor is cost, which is basically irrelevant. If you find those facts, then you can't not mainstream. You must mainstream the student. That's a legal requirement. And that's one of the problems. It's not just the Rowley case that is questioned by the district court in this case. There are many legal requirements under IDEA that the district court ignored, and that one was one of the most important ones. The school district is required to accommodate whatever accommodations are needed to make sure that that child stays in the general ed environment before they remove her from that. And they would never, this is, if the standard changed in this case, your honor, it would be a double standard, because there's no way a school district could have placed this child at the landmark school and been able to justify that to an administrative law judge in Washington. And the parents never requested an IP hearing, right? They requested an IP? A hearing. A due process hearing. Correct, they didn't request, I think that's another thing that's really important. If Rowley changed, and we get into outcomes, and you measure what happens at landmark, and that's the test, you're going to be waiting until all these events occur before you file due process hearings. And of course, the purpose of the idea, and originally when they passed the idea, they thought what we would have is an IP meeting, and if there was a dispute about the IP meeting, there'd be a, the district is required to do a prior written notice, as your union case in Ninth Circuit discusses. We have to do a prior written notice after every IP meeting and say what we propose and what we refuse. And so the idea was, parents would ask for something, and if the school district didn't accept it, they'd refuse it. That, as the Ninth Circuit said, would then be the paper that would show as a pleading, essentially, of what the issues are, and the parent would immediately go to a due process hearing. The decision has to be done in 45 days, and you would immediately correct the problem, and instead of waiting three years after the potential issue comes up, you would have it done, and you wouldn't have, I mean, the policy of waiting, the policy of having outcomes is that you have all these children who can't afford a unilateral placement to a residential school in Massachusetts, who can't do that, have to wait to decide whether the program their child's been in over the last two years was appropriate. And of course, at that time, there's no way of correcting it. So if you want to make a rebuttal argument, you better stop and reserve a couple of minutes. Take your time. Gave you a couple of bonus minutes by not having the clock going. Mr. Powers. Thank you, yes, it would please the court. We would add a minute or two to your time, if you need. I thank you. Because we ran some time earlier. Thank you. If I'm not mistaken. Thank you, I'd like to make a couple preliminary points. One is this, is that the parents have established before the district court deficiencies in almost every way possible, in the way that the school district evaluated the student, in the process by which her IEPs were developed, in the plan's contents, in the manner in which the IEPs were implemented. Prior to switching schools, what notice did the school have? Prior to switching schools, though the parents had met with the school district a number of times, and had expressed their concerns about the program. Some of them were actually written on the IEP itself. Parents are concerned about that. Do the parents go to the school and say we're transferring? Yes, yes. And that's the reason why? Yes. And give the school time to convene another hearing? Yes. Under the law, the parents did comply with the written notice requirement. And they did give the school district the required notice. And did the hearing take place? Did the hearing take place? Yeah. Well, the hearing, they didn't request a hearing until about. After they moved the child. Yes, until after they moved. Which is. They pretty much moved the child on their own motion, right? Of course, of course. And of course, that's been allowed since the Burlington decision, the Supreme Court decision in 1985, and is now codified as is their right. And in fact, if you read. We're not dealing with what the code is now, it's what it was when the event took place. Yes, and that's what the code was when the event took place. And the code, Burlington was codified so it expressly gives the parents right to give the notice, then move their child, and then seek reimbursement. And just a couple things on that one point, since it was one of the last discussed. The first is that there was at the time a three-year statute of limitations that was applicable to this. There is now, I shouldn't say a statute of limitations, there was a three-year limitation period. There is now in the Federal Act, a two-year limitations period, but this case predated that. So the parents had three years before they actually requested a hearing to challenge it. Let me ask you this though. Certainly. Did the parents raise any concerns about transitional services and their objections to the proposed IEPs or before the ALJ? Absolutely. Their concerns were, in effect, it was written on the IEPs themselves that while the parents wanted their child, were looking into college for the child, that the school district had a lesser focus. But one of the bigger concerns, and the parents had repeatedly expressed their concerns about their child's progress, and that was written on the IEPs. One of the important points of this case is that the parents, of course, didn't know whether there was a solution to the problem or what to tell the district to do about it. The school district has the affirmative obligation, and this has been found in Ninth Circuit precedent over and over, most recently in Enby versus Hellgate, to affirmatively, proactively go out, retain the independent experts needed to find out why a child isn't progressing adequately and to make the corrections. You can't rely on the parents to come to you and say, this is what needs to be done for our child, we know. Eventually, they did, eventually. Well, it seems that some of the testing that the school district wanted to do initially, your clients weren't returning consents on that. No, that's absolutely incorrect, and the district court supported the parents' position in that regard. What happened was the parents had requested an independent evaluation, which is an important procedural protection by which they are able to select an independent evaluator at school district expense, and that that input has to be considered. Parents get to select the evaluator, not the school district, and the school district admitted this. What the school district did in response to the parents' notice that they were going to place their child was to say, we want to conduct the independent assessment with the people we select. That's what the parents didn't immediately consent to. As soon as the school district changed their proposal to a re-evaluation of its own, the parents immediately signed the consent and made the child available for assessment. So that's one of the serious errors that the administrative law judge made. She simply conflated, confused the distinction between a school district re-evaluation and an independent assessment, which is a parent right, in order to obtain independent expertise. Mr. Powers, I will have to say I'm concerned with the issue that Judge Callahan raised in your opponent's argument. That is, you know, can the district court say that the Raleigh standard has been changed by these legislative amendments?  When they don't refer to Raleigh, it seems sort of bizarre, frankly, to me. I don't know what the implications of it are for the case, but I'm having trouble seeing how the Raleigh standard could be eliminated by these amendments. So I'm wondering if we have to vacate in part, at least in remand, for the district court to apply the correct standard. Well, I don't think that the district court applied the incorrect standard. I think the district court applied the same standard that this court just established, again, in Enby v. Hellgate. But the district court said that the 1997 amendments changed the Raleigh-Adams standard. But yet, Raleigh-Adams existed when the 19, well, I mean, that standard existed when the 1997 amendments were passed. And, you know, straight statutory construction, the rules presume if there's a case out there, which this is a cornerstone case. It comes up in every IDAA case. I mean, it's out there. They knew of its existence, and if they thought it was wrong, Congress could change that. Yeah, and let me explain how Congress did change that. This is not a case that just involves the statement of intent and the purpose of the act. There's two major things that changed in 1997. One is enhancing the transition requirements to make sure that school districts provide instruction geared towards enabling the child to achieve post-secondary school employment and independent living. They also made it a requirement that the concerns of the parents in this regard, and in all matters related to their child's education, be reflected in the IEP. And here's the most critical one, and this is the one that the lesser case that the school district cited in its post-hearing, its post-briefing memorandum. The most important change that it made, and this is a change in the substantive mandate of the act, is that instead of simply requiring IEPs to include a statement of measurable annual goals, which has always been required, for the first time in 1997, the IED required a statement of the special education-related services to allow the child to advance appropriately towards attaining the annual goals. And on top of that, statutory change. They also required the parents to be regularly informed of the progress towards achieving goals. So when are they supposed to start doing that? What age? This applies to kids of all age. These are two separate requirements. The transition requirement starts at age 14. In other words, at age 14, you start, you shift the focus of the child's program to, you say, where does this child need to be when this child finishes high school? And the reason that that was done is that Congress did studies, looked at studies that showed that up to that point, that despite their best efforts, kids with disabilities were leaving schools unable to be self-sufficient, unable to attain gainful employment or to succeed in college. So why didn't the school district do that here? I mean, the disagreement here seems to be that the parents felt she should go to a four-year college and they were looking at vocational or junior college or community college. Well, that's not even the case, Your Honor. What the people who were implementing the program, in fact, said is that what they were looking at was vocational, technical endeavors. In vocational, they weren't even looking at community college. So I, and the district court did find that and that site is referenced to the record, is referenced in the brief. But the point being is there's two different requirements. The transition applies at age 14. The requirement that programs, IEPs, be formulated to achieve goals, the student's goals, to attain the goals, not just to make some or any progress at all towards them, is found for the first time in 1997. That applies to all kids throughout any age and it has never was in the act before. The Lesser case, that wasn't argued before the Lesser case. That wasn't the facts of that case. What do we do, what do we do if we think that the Raleigh standard survives and coexists with these amendments? I think the Raleigh standard, I think that this court can rule that the Raleigh standard. Raleigh talks about, you know, the IDEA requiring a basic floor of education, not necessarily the best education anyone could get. Absolutely, and that remains the case. But the district court said that no longer remains the case. No, I disagree, Your Honor. I think, I'm sorry, go ahead. Didn't she say Raleigh no longer applies? I think she, no, all she said, at least the way I read the ruling, is that Raleigh no longer applies to the extent that when you're measuring the sufficiency of the benefit that the child receives, whether or not it's meaningful. And when you look at what's meaningful, it has to be in comparison to what the goals of that child's programs are as required by the current version of the law. I didn't recall her using a, to the extent kind of phrasing. I thought she just said it was undermined. Well, I think, and I think that the way that the Enby versus Hellgate said is as elegant and efficient as you can. But in other words, there's now an enhanced meaningful benefit standard. And it's enhanced by these substantive requirements. To say that there's a floor of opportunity, of course there is. Parents aren't arguing that the standard is now that you do anything you can think of for a child. Or that whatever a parent wants for a child, even if it's unreasonable given that child's capabilities, is something the school has to do. I think what Judge Gould, though, is getting at, let's say we were to reject the district court's interpretation of the standard under the IDA. May the panel determine the adequacy of the school district's IEPs, or should the adequacy be considered by the district court on remand? I think this panel can do it very easily because. We go back to the AALJ. I don't think either is necessary. I think that, I mean, I think what the district, what the, if you take the district court's facts as they were found, I think it's clear that no standard, no meaningful standard has been met. And Ninth Circuit has defined the floor of opportunity and the level of some educational benefit a student is entitled to as meaningful long before 1997. So the question is, is to what extent, if any, has it been enhanced by the 1997 amendments? So I think by any meaningful benefit standard, here's a student that met none of her goals, less than a quarter of her objectives while in the school district, was reading at five and six years behind grade level in grade nine and seven years behind in writing. It was a student who needed everything read to her, everything written for her, was becoming, completely lost self-esteem and belief that she could learn, and was going to be lost for school. Now, the only thing that the district really points to is grades and progress in areas that are outside of literacy, areas that aren't even at issue. There seemed to be something that the mother said she started doing, the child's homework, but is there any indication in the record that the district knew about that? Yes. Where is that in the record? I have to, I don't have the reference to it handy. Well, they actually tested the school staff. The parents were communicating regularly with the school staff about that. And the, I mean, this was being done to her at school. This isn't just something, she was provided with a reader at school as well, too. That was on her IEPs. This isn't as if this was being done at home and not being done at school. This was part of the accommodation. See, the difficulty, we don't disagree with the district that the Mercy- I don't disagree with you that probably, it seems, sounds like Landmark can do a better job, did a better job with her. But still, in evaluating, I mean, we have to look at, I mean, there's a factual challenge to the school district's IEPs, and we have to find that they didn't follow the law, not whether Landmark can do a better job. I mean, it seems like Landmark did do a better job with her, but that's not the, that really isn't the inquiry. Agreed. And it wasn't the school's decision that the child go to Landmark. No, it was the parents- It was a parent thing, and the school had no notice of it until after the fact. No, that's not the case. No, no, again, Your Honor, the parents get complied with the requirement to give the school district written notice beforehand that they intended- Not the case, before Landmark started. I think the notice was given, it was either in June, you know, it was in the summer beforehand, but it was, I don't remember the- What does the record say? Let me see if I can find the, I can give you the- Were the school personnel on strike at that time? Not to my knowledge, Your Honor. Let's see. My recollection, though it could be wrong, was that the notice was given less than 10 days- That's right. Before the new enrollment. I'm sorry, did you say there was an allegation to that? No, I thought that the notice- Well, we have two cases where parents- Oh, no, no, there's no issue here regarding the notice. It's never been raised. What I'm saying is I thought it was given less than 10 days before. No, that's not correct. That's not correct. Let me think if I can see if I can find the exact, oh, it was on August 4th. Well, that's a little different than June. And when did school start? In September. What day? 1st of September? The 4th. And that's when it actually started? Yes. And were the school personnel there to participate? If there were any conference at all about it? Or were they on summer vacation? You mean in between the two? Yeah, those two days. Well, the school staff- You fell through the cracks there between the time the child left and the program and what was wrong with the program. No, the school staff, in between the time the school staff were negotiating with the parents during that time for- In other words, it was during this period of time that the parents in the school district were also negotiating over the independent assessment. In other words, the school district was saying, okay, then we want to do the independent assessment. And the parents were saying, no, you can't do that. So certainly the school personnel were around. I didn't think school was in session, but the school personnel were communicating with the parents during this time. And the record's clear about that. So the parents complied with what they did. And the important thing to keep in mind in this case, too, is that the parents put in writing everything that they wanted the school district to do in the way of an IEP. And then the school district didn't do it. And in fact, the testimony of the school district staff is that the fact that it wasn't included in the IEP after the parents had requested it was meant to convey to the parents that this is something the school wasn't going to do. So this isn't the case in which there was a hide the ball. The parents attended the meetings. They brought an expert to the meeting when they had an expert to bring. But it wasn't until the- They just couldn't wait any longer. So it wasn't until after the student was placed that they were first able to have outside experts to become involved to try to help. And then the ALJ, because of that independent placement, reduced the recovery. Is that correct? The ALJ reduced the recovery because the ALJ believed that the parents had unreasonably delayed the evaluation process. But the district judge- Reversed it. She reversed it because she realized the administrative law judge didn't properly recognize the distinction between an individual education assessment and a re-evaluation. It's a fact finder. The district judge or the ALJ? Well, before this Court, it's the district judge. I mean, the district judge reviews the record and makes an independent determination of the facts based on the record. So the district judge- Let's say, but if the ALJ hears certain witnesses and makes certain determinations about credibility or other than- Then the district judge isn't in any different position than we are. We would have to give deference to credibility findings of the ALJ, wouldn't we? Except that under the law, if there- If it's a legal error, that's one thing. Yes, but two things on that. First of all, if there is compelling evidence in the record, clear evidence in the record, extrinsic evidence, that the weight that the ALJ gave the witness was unjustified, then the ALJ is not entitled to deference. The district court doesn't have to give the ALJ deference on that. Was there anything in the record at all that supported the district court's- I mean, the ALJ reasoning? No, I don't believe so, Your Honor. They just kicked this out of the air and said, oh, we're going to just even things out and it will knock off six months of the program. I think what- Oh, you're talking about the reduction? Yeah. There was just a lot of back and forth between the parties about it. You know, I don't know. I can't answer the question. How did the district judge give more attorneys fees than the parties had stipulated to? Because what happened was that after the parents- We filed our motion. The parents filed their motion for fees. And asking for fees based on the current rate for all the time billed and- I mean, I'm sorry. Asking for the current applicable rate at the time that the fee request was made, going back for all the time spent on the case. After the motion for fees was made, the school district and the parents reached an agreement that parents would be compensated for all of their time, but if the actual rate charged the client. So there was a slight reduction. The school district filed the stipulation, but didn't link it, didn't, as you're supposed to do, didn't reference the fee motion. So my supposition is that what happened is that afterwards the district court didn't know that there was a stipulation that affected that and simply ruled on the motion because the school district didn't answer the motion. So that's my supposition, but I don't know. Okay. Well, we're over your time, but I thought you should get a couple extra minutes because the- Actually, the clerk gave you a couple extra and you got a couple more, so you got a lot. Okay. I guess we should conclude your argument. Okay. Thank you. Thank you, sir. Let Mr. Dionne make a brief rebuttal. Your Honor, I appreciate it. I just have a few minutes and I appreciate the opportunity to do it. I have so many things to say to deny the facts as they were presented to you. There was no concern of transitional services argued in the due process hearing. It was never raised. You can look at the pleading that he filed when he filed the case. It's not one of the issues. In fact, there's no question about college. College was never brought up until the last IEP meeting in March after she had already been in the landmark school. And it was brought up in passing by Mr. Powers, the attorney for parents. Parents never argued for college, never asked to have it put on the IEP meeting. In March, and as soon as they asked for it in March, the school district put it on, that parents believe there might be a chance she's going to college. It's right on that IEP. But they had to do some transitional planning anyway under the law. And we did, Your Honor. In fact, the IEP preceded that in September, right at the beginning of school. The school district paid for their evaluator and then invited her to an IEP meeting and wrote an IEP in September at the beginning of school and accepted everything that she said, almost everything. I'd hate to say everything, but almost everything she asked for, the school district put in the IEP. Dr. Hill. Dr. Hill, including three transition services that she asked for. She did not ask to change the school district's statement on the IEP that the plan was to have either community college or a technical school. She didn't ask to change that. And that was the interest that was expressed by the student KL. The law says that when a student doesn't show up in an IEP meeting, you must consider the student's interest. And the student's interest had been expressed in an evaluation that she wanted to actually start working after school and not do either the vocation or the community college. But that was an earlier statement by her, so both were left on the IEP. There was no question about transition services, and as soon as college was asked for the school district put it on the IEP. The fact is that IEP, everything that was in that IEP, the idea that the school district didn't accept everything that was being asked for, the only thing, first of all, you had two IEP meetings. We paid for the evaluation by their evaluator, Dr. Hill. We included almost everything she asked for on the 922 IEP. In March, because parents still said right after the meeting, although we did that, we're still not going to bring her back. We're leaving her at Landmark. And so the school district went out and got another evaluation by Children's Hospital. And the Children's Hospital expert, Dr. David Brager, showed up at the March meeting, and the only thing that was not put on the March meeting that parents asked for were those things that Dr. Brager said the diagnosis by Dr. Hill was invalid, and it was incorrect. And so the school district in that situation took the recommendations of Dr. David Brager when the record showed that the diagnosis, she made a couple of diagnoses about a language disorder that wasn't proven when the child was sent to an actual language specialist, and she made a diagnosis of a mood disorder that also turned out to be incorrect when the school district sent her to a psychiatrist, and the parents even and the student, when they went to the psychiatrist, said there was absolutely no thought that this child had a mood disorder. She was a happy kid. The only real problem in this case, and the thing that I think the school district that gets left out of the consideration is that this child was out of school for about four weeks before she left for Landmark. She was ill. She had a virus that kept her out of school for almost the full month of March before the end of school. So she never really put in nine months that school year to accomplish her goals, and she did accomplish her goals. She got seven out of 15 of them on the written language goals. She had two more that she achieved because the progress report wasn't at the end of the school year. I'm staring at a red light. I appreciate it. Thank you very much for your challenge. I'd be a bit upset if I don't say we've got to bring this to a close. Thank you. I appreciate the argument. Jail v. Mercer Island School District shall be submitted, and the court will take a 15-minute recess.
judges: Beezer, Gould, Callahan